WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Navajo Nation, | No. CV-03-00507-PCT-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| United States Department of the Interior; et al., | |
| Defendants. | |

Pending before the Court are multiple related motions. They include: (1) Defendants United States Department of the Interior (the "Department"), Secretary of the Interior Sally Jewell, Bureau of Reclamation, and Bureau of Indian Affairs' (the "Federal Defendants") Motion to Dismiss (Doc. 240), (2) Defendant-Intervenor State of Arizona's Motion to Dismiss (Doc. 242), (3) Defendant-Intervenors Metropolitan Water District of Southern California and Coachella Valley Water District's (the "Metropolitan Defendants") Motion to Dismiss (Doc. 243), (4) Defendant-Intervenors Salt River Project Agricultural Improvement and Power District and the Salt River Water Users' Association's (the "SRP Defendants") Motion to Dismiss and to Join Required Parties (Doc. 249), (5) Defendant-Intervenor Central Arizona Water Conservation District's Motion to Dismiss (Doc. 250), (6) Defendant-Intervenor Imperial Irrigation District's Motion to Dismiss (Doc. 251), (7) the Hopi Tribe's Motion to Intervene (Doc. 252), (8) the Hopi Tribe's Motion to Dismiss (Doc. 253), and (9) Defendant-Intervenors Colorado River Commission of Nevada, State of Nevada, and Southern Nevada Water Authority's

(the "Nevada Defendants") Motion to Dismiss (Doc. 254).

For the following reasons, the Federal Defendants' Motion to Dismiss is granted and the remaining Motions are denied as moot.

## BACKGROUND

### I.    The Navajo Nation

Plaintiff Navajo Nation (the "Nation") is a federally recognized Indian Tribe. (Doc. 281, "Second Amended Complaint" ("SAC") ¶ 10.) The Navajo Nation's Reservation (the "Reservation") is the largest Indian reservation in the United States, with land spanning over 13 million acres located in Arizona, New Mexico, and Utah. (*Id.* ¶ 11.) The Reservation was originally established by the Treaty of June 1, 1868, 15 Stat. 667, and was expanded by a number of Executive Orders and Acts of Congress between 1868 and 1964. (*Id.* ¶ 12.) The Reservation is adjacent to the Colorado River and is located in both the Upper and Lower Basins of the Colorado River Basin. (*Id.*) This case concerns only the lands located in the Lower Basin in Arizona (the "Lower Basin"). (*Id.* ¶ 5.)

The SAC alleges that by establishing the Reservation, "the United States impliedly reserved for the benefit of the Navajo Nation a sufficient amount of water to carry out the purposes for which the Reservation was created, specifically to make the Reservation a livable homeland for the Nation's present and future generations." (*Id.* ¶ 14.) It further alleges that an effect of establishing the Reservation "was to create a trust relationship between the Navajo Nation and the United States," (*Id.* ¶ 15), that "requires [the United States] to protect the Navajo Nation's land and the water necessary to make those lands livable as a permanent homeland for the Navajo Nation" (*Id.* ¶ 16).

The Nation alleges that the United States has failed in its trust obligation to assert and protect the Nation's water rights by "expressly" leaving "open the question of the Navajo Nation's beneficial rights to the waters of the Colorado River." (*Id.* ¶¶ 17–18, 20–22.) The Nation claims that it has asked the Department to address the extent of the Nation's rights to use, and its interest in, water from the Lower Basin, but that the

1
2
3
4

Department has not done so. (*Id.* ¶ 25.) Further, the Federal Defendants "have never sought, through judicial or administrative means, to quantify or estimate the Navajo Nation's rights to water from the mainstream of the Colorado River in the Lower Basin." (*Id.* ¶ 26.)

5
6

## II.   *Winters* and Reservation Water Rights

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The Nation asserts that it has water rights in the Lower Basin of the Colorado River pursuant to *Winters v. United States*, 207 U.S. 564 (1908), and its progeny. Beginning with its decision in *Winters*, the Supreme Court "has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976). "In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators." *Cappaert*, 426 U.S. at 138. Further, this right "is not dependent on beneficial use" and "retains priority despite non-use." *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, 201 Ariz. 307, 310–11, 35 P.3d 68, 71–72 (2001). This doctrine applies to Indian reservations. *Cappaert*, 426 U.S. at 138; *Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800, 805 (1976); *United States v. Dist. Court for Eagle Cnty*., 401 U.S. 520, 522–23 (1971); *Arizona v. California*, 373 U.S. 546, 601 (1963) [*Arizona I*]; *FPC v. Oregon*, 349 U.S. 435 (1955); *United States v. Powers*, 305 U.S. 527 (1939); *Winters* 207 U.S. 564.

23
24
25
26
27
28

In 1952, the State of Arizona brought suit against the State of California and seven of its public agencies, alleging that it was entitled to a certain quantity of water from the lower Colorado River under the Colorado River Compact of 1922 and the Boulder Canyon Project Act. (Doc. 240-1 at 9.) Arizona sought a decree confirming its title to that quantity of water. (*Id.*) The United States sought and was granted leave to intervene in that action. *Arizona v. California*, 347 U.S. 985 (1954). In the action, in its role as trustee,

the United States claimed federally reserved *Winters* water rights in the Lower Colorado River on behalf of a number of entities, including the Nation. (Doc. 240-1 at 9.) However, the United States filed its *Winters* rights claim on behalf of the Nation only with respect to water from the Little Colorado River, a tributary of the Colorado. (*Id.*) The Supreme Court referred all of the matters in the *Arizona v. California* litigation to a Special Master for evidentiary proceedings. (*Id.*) The Special Master recommended that conflicting claims to the Little Colorado River not be adjudicated in *Arizona v. California*, and the Supreme Court, in its 1963 Opinion, affirmed that recommendation. 373 U.S. 546, 595 (1963) (the "1963 Opinion"). Thus, while the United States did file and present a claim for rights to the Little Colorado River on behalf of the Nation, that claim was not ultimately adjudicated in that action. (Doc. 240-1 at 10.) Therefore no determination was made as to whether the Nation was entitled to any particular quantity of water coming from the Little Colorado River.

## III.   The Challenged Administrative Actions

Following this 1963 Opinion, the Court issued the 1964 Decree. 376 U.S. 340 (1964). Under Article II of the 1964 Decree and the Boulder Canyon Project Act, 43 U.S.C. §§ 617–617u, the Secretary is responsible for the allocation of the waters of the mainstream of the Colorado River among California, Arizona, and Nevada (the "Lower Basin States"), and for deciding which users in those Lower Basin States will be delivered water under the Act. (SAC ¶ 33.) The Secretary has undertaken various actions to do so which the Nation now challenges. These include:

- *Record of Decision, Colorado Interim Surplus Criteria; Final Environmental Impact Statement*, *reprinted at* 66 Fed. Reg. 7772, 7773–82 (Jan 25. 2001) ("Surplus Guidelines ROD") for the *Colorado River Interim Surplus Criteria Final Environmental Impact Statement* (Dec. 2000) ("Surplus Guidelines FEIS"), pursuant to Article III(3)(b) of the *Criteria for Coordinated Long-Range Operation of the Colorado River Reservoirs Pursuant to the Colorado River Basin Project Area Act of September 30, 1968* (P.L. 90-537) (June 8, 1970) ("LROC").

- 4 -

The Surplus Guidelines ROD adopted guidelines for the Secretary to determine when there is a surplus of water from the Colorado River for use within the Lower Basin States. The LROC requires the Secretary to determine the extent to which the requirements of mainstream water uses in those states can be met in any year. The Surplus Guidelines FEIS considered five alternatives for interim surplus guidelines. (SAC ¶¶ 36–40.)

- *Record of Decision, Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead, reprinted at* 73 Fed. Reg. 19,873 (Apr. 11, 2008) ("Shortage Guidelines ROD") for the *Final Environmental Impact Statement, Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead* (Oct. 2007) ("Shortage Guidelines FEIS"). The Shortage Guidelines ROD adopted guidelines for the Secretary to use to manage Lake Powell and Lake Mead under low reservoir and drought conditions. The Shortage Guidelines FEIS analyzed five alternatives for those interim shortage guidelines. (SAC ¶¶ 41–45.)

- *Final Environmental Impact Statement, Implementation Agreement, Inadvertent Overrun and Payback Policy, and Related Federal Actions* (Oct. 2002) ("Implementation Agreement FEIS"). The Secretary, through the Bureau of Reclamation, developed the Implementation Agreement FEIS to analyze a procedure requiring the Secretary to deliver California's share of Colorado River water in accordance with a certain agreement and to require payback of water used in excess of the amounts set forth in contracts entered into under the Boulder Canyon Project Act. (SAC ¶¶ 46–49.)

- Offstream Storage of Colorado River Water and Development and Release of Intentionally Created Unused Apportionment in the Lower Division States, 64 Fed. Reg. 58,986 (Nov. 1, 1999), 43 C.F.R. pt. 414. The Secretary adopted final regulations under which she may enter into certain agreements with the Lower Basin States to permit offstream storage of those States' individual entitlements.

- 5 -

(SAC ¶¶ 50–51.)

- The *Storage and Interstate Release Agreement* (Dec. 18, 2002) ("Storage and Release Agreement") with the States of Nevada and Arizona, pursuant to the regulations described above, creates a program of interstate water banking of those States' entitlements under the Decree in *Arizona v. California*. (SAC ¶¶ 52–55.)

The Nation does not allege that any of these actions actually regulate any of its activities. Instead, it argues that because the United States did not determine the extent and quantity of the Navajo Nation's water rights under *Winters*, the Secretary's subsequent actions in connection with the management of the Lower Basin, pursuant to the Decree describing the management of the Colorado River in *Arizona v. California¸* 376 U.S. 340 (1964) ("the 1964 Decree")*,* have otherwise allocated the waters of the Colorado River in a way "that threaten[s] the availability of Colorado River water to satisfy the Navajo Nation's rights and needs." (*Id.* ¶ 29.) The Nation alleges that these actions "establish[] a system of reliance upon the Colorado River that ensures that entities other than the Navajo Nation will continue to rely on water supplies claimed by, reserved for, needed by, and potentially belonging to the Navajo Nation." (*Id.* ¶ 31.) In turn, "[s]uch reliance will operate to make allocation of Colorado River water to the Navajo Nation to satisfy its water rights or meet the needs of the Navajo Nation and its members increasingly difficult." (*Id.*)

The United States "generally agrees that [the Nation] has reserved water rights under the *Winters* doctrine." (Doc. 240-1 at 41.) But, it claims it has assisted the Nation with acquisition of water supply in the San Juan Settlement and that it is currently pursuing the establishment of *Winters* rights in the ongoing general adjudication of the Little Colorado River System (*Id.*), and that additional mainstream water may be available to the Nation should the various applicable parties be able to arrive at a water rights settlement under the Arizona Water Settlements Act (*Id.* at 33–34).

## IV.   Claims One, Two, Three, and Five

In Claims One, Two, Three, and Five of its Second Amended Complaint, the

- 6 -

Nation alleges that the Federal Defendants violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") by undertaking the actions to manage the Lower Basin flow described above.

In Claim One, the Nation alleges that the Implementation of the Surplus Guidelines violates NEPA and the APA. It claims that the United States failed to meet the NEPA requirement to take a hard look at all of the effects of proposed federal action because it did not consider the rights of the Nation. (SAC ¶¶ 63, 64.) Further, the Nation claims that the Surplus Guidelines FEIS states that the United States examined all Indian water rights that could be affected by implementation of the LROC, but that this statement is false because the Unite States did not consider the needs of the Nation's possible right to mainstream water in the Lower Basin. The Nation argues that, as a result of these failures, the documents are "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, [and] short of statutory right." (*Id.* ¶ 67.)

In Claim Two, the Nation alleges that the Implementation of the Shortage Guidelines was similarly deficient because the United States claimed in the Shortage Guidelines FEIS that it examined all Indian water rights that could be affected by implementation of the LROC, but did not actually consider the needs of the Nation. (*Id.* ¶¶ 69–71.)

In Claim Three, the Nation alleges that the Development of the Implementation Agreement FEIS is also lacking as the Implementation Agreement FEIS also purports to have examined all Indian water rights that could have been impacted, but did not do so because it did not actually consider the needs of the Nation. (*Id.* ¶¶ 73–76.)

In Claim Five, the Nation alleges that the Federal Defendants violated NEPA and the APA by entering into the Storage and Release Agreement. It claims that the Agreement fails to consider the Nation's unquantified rights and memorialized a plan for water banking without considering those rights. (*Id.* ¶¶ 82–84.)

## V.     Claim Four

In Claim Four, the Nation alleges that the Implementation of the Interstate Banking Regulations violates the APA. It alleges that the Secretary failed to protect the Nation's rights to and interests in the water from the Lower Basin. In so doing, the regulations allow entitlement holders other than the Nation to store water they would otherwise be unable to use and allows those entitlement holders to develop reliance upon the use of those waters, which may potentially belong to the Nation. (*Id.* ¶¶ 78–79.) This, the Nation alleges, resulted in a final rule that is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, [and] short of statutory right." (*Id.* ¶ 80.)

## VI.     Claim Seven

In Claim Seven, the Nation notes that under *Winters*, it requires water from the Lower Basin of the Colorado River to fulfil its purpose as a permanent homeland. (*Id.* ¶ 90.) By failing to determine the extent and quantity of the Nation's water rights, the United States breached its fiduciary obligation to the Nation. (*Id.* ¶ 91.)

## VII.     Pending Motions

The Nation brought these six claims against the Federal Defendants.[1] (Doc. 281.) The Federal Defendants now move to dismiss each of these claims. (Doc. 240.) In their Motion to Dismiss, the Federal Defendants argue that Plaintiff has failed to establish standing to bring Claims One through Five and that it has failed to identify a breach of a specific, enforceable trust obligation and waiver of sovereign immunity that allows it to bring Claim Seven. (*Id.*)

Additionally, various Defendant-Intervenors have joined the case and filed their own Motions to Dismiss. (Docs. 242, 243, 249, 250, 251, and 254.)[2] Also pending are the

---

[1] The Nation voluntarily struck their Sixth Claim for Relief. (SAC ¶¶ 85–88.)

[2] The SRP Defendants' Motion to Dismiss also includes their Motion to Join Required Parties. (Doc. 249.)

- 8 -

Hopi Tribe's Motion to Intervene (Doc. 252) and Motion to Dismiss (Doc. 251).

## DISCUSSION

### I.      Legal Standard

The Court may only reach the merits of a dispute if it has jurisdiction to do so. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998). Jurisdiction is limited to subject matter authorized by the Constitution or by statute. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Under Rule 12(b)(1), a defendant may challenge at any time a federal court's jurisdiction to hear a case. *See* Fed. R. Civ. P. 12(b)(1), 12(h)(3). In such a challenge, the defendant may either facially or factually attack the plaintiff's complaint for lack of subject matter jurisdiction. A facial challenge asserts that the complaint, on its face, fails to allege facts that would invoke federal jurisdiction. *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2003). A factual attack, on the other hand, disputes the veracity of allegations in the complaint that would, if true, invoke federal jurisdiction. *Id.*

### II.     Standing

To establish Article III standing to seek injunctive relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

Under the first prong, the Nation alleges that it is under the threat of suffering "injury in fact" due to the challenged administrative actions in Counts One through Five. The Nation states that in establishing the Navajo Reservation, "the United States impliedly reserved for the benefit of the Navajo Nation a sufficient amount of water to carry out the purposes for which the Reservation was created, specifically to make the Reservation a livable homeland for the Nation's present and future generations." (Doc.

281, SAC ¶ 14.) While the Nation alleges that they have these water rights, they also assert that the United States has never adjudicated, quantified, or estimated these rights as to the mainstream of the Colorado River in the Lower Basin. (*Id.* ¶¶ 25–26.) However, consistent with *Winters*, the Nation does not challenge the Federal Defendants' assertion that the priority of any such rights will not be legally impacted by any of the challenged administrative actions. That is because any such water rights "vested at least as early as the date of each congressional act or executive order setting aside the Reservation lands" (*Id.* ¶ 14), which occurred between 1868 and 1964 (*Id.* ¶ 12), many decades before any of the challenged administrative actions (*Id.* ¶¶ 36, 41, 46, 50). Further, under *Winters*, any such rights would retain priority despite non-use.

The Nation also does not allege that any of the challenged actions directly regulate any of the Nation's activities. Instead, they assert that the actions regulate third-party activities, and that this regulation, devised without consideration of the Nation's potential water rights, could cause injury to the Nation because it "establishes a system of reliance upon the Colorado River that ensures that entities other than the Navajo Nation will continue to rely on water supplies claimed by, reserved for, needed by, and potentially belonging to the Navajo Nation." (*Id.* ¶ 31.) In turn, "[s]uch reliance will operate to make allocation of Colorado River water to the Navajo Nation to satisfy its water rights or meet the needs of the Navajo Nation and its members increasingly difficult." (*Id.*)

Here, in Claims One, Two, Three, and Five, the Nation alleges a number of procedural violations under NEPA. For these claims, the Nation may demonstrate injury under the standard for demonstrating a procedural injury under that statute. To show that these alleged procedural violations constitute a cognizable injury for purposes of establishing Article III standing, the Nation "must demonstrate that (1) [Defendants] violated certain procedural rules; (2) these rules protect [Plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (citing *Citizens for Better Forestry*, 341 F.3d at 969–70)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, the Court will assume without deciding that the Federal Defendants violated some procedural rules of NEPA, that the Nation has some kind of interest in the water of the Lower Basin, and the procedural rules protect the Nation's interests in that water. This satisfies the first two prongs of the NEPA injury inquiry. Under the third prong, the Nation must demonstrate that it is "reasonably probable" that the challenged administrative actions will threaten their interests. The Nation has not done so. As explained above, the only injury the Nation asserts in this case is that the challenged administrative actions will create a system of reliance that will somehow make it harder for the Nation to satisfy its water rights, even though the Nation concedes that these challenged actions do not vitiate those rights or otherwise legally alter those rights under *Winters*. The Nation does not explain how any "system of reliance" created by the challenged administrative actions could nonetheless injure the Nation's interests. Without this connection, the Nation has not demonstrated that it is "reasonably probable" that the actions will threaten their interests. Thus, in Claims One, Two, Three, and Five, the Nation fails to establish injury under the standard for establishing a NEPA procedural injury and therefore the Nation does not have Article III standing to bring those claims.

In Claim Four, the Nation alleges that the Implementation of the Interstate Banking Regulations violates the APA, but not NEPA. As the Nation does not bring Claim Four under NEPA, it is not relevant whether it meets the Ninth Circuit's requirements for establishing injury under that particular statute. However, the Nation must still establish injury under this Claim for Article III standing. As in Claims One, Two, Three, and Five, the Nation alleges that the challenged regulations will allow entitlement holders other than the Nation to develop a system of reliance on water that may someday be determined to belong to the Nation. As with Claims One, Two, Three and Five, the Nation fails to allege any facts to suggest that any possible injury deriving from a theoretical, future "system of reliance" is "actual or imminent" as opposed to merely "conjectural or hypothetical." *Summers*, 555 U.S. at 493. Thus, Plaintiffs also fail

to establish standing to bring Claim Four.[3]

### III.    Breach of Trust Claim

#### A.    Trust Relationship

In its Claim Seven, the Nation challenges the Federal Defendants' alleged breach of their fiduciary trust responsibility. (SAC ¶¶ 90–91.) The Nation asserts that "[t]he Department has failed to determine the extent and quantity of the water rights of the Navajo Nation to the waters of the Colorado River, or otherwise determine the amount of water which the Navajo Nation requires from the Lower Basin of the Colorado River to meet the needs of the Navajo Nation and its members." (*Id.*) To remedy this alleged violation, it asks the Court to enjoin "further breaches of the United States' trust responsibility." (*Id.* ¶ L.) The Nation claims that this "primary breach of trust claim is not premised on the APA." (Doc. 282 at 67.)

While the Ninth Circuit recognizes that the United States owes a general trust responsibility to Indian tribes, "unless there is a specific duty that has been placed on the government with respect to Indians, [the government's general trust obligation] is discharged by [the government's] compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Gross Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) (quoting *Morongo Band of Mission Indians v.* FAA, 161 F.3d 569, 574 (9th Cir. 1998)). Here, the Nation argues that the Colorado River Compact of 1922 created a specific, enforceable trust obligation in stating that "[n]othing in this compact shall be construed as affecting the obligations of the United States of America to Indian tribes." (Doc. 282 at 64; Doc. 293 at 14.) But, by its terms, this statement does not

---

[3] A plaintiff bringing a suit under the APA must also fulfill statutory standing requirements by establishing "(1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the zone of interests of the statutory provision the plaintiff claims was violated." *Citizens for BetterForestry*, 341 F.3d at 976 (citations omitted). Because the Nation does not establish Article III standing to bring its APA/NEPA claims, the Court need not address whether the Nation meets the additional requirements for statutory standing.

create any new or additional obligations of the United States of America to Indian tribes. It merely recognizes the existence of such rights as may have pre-existed the Compact. The Nation has not identified a relevant, specific duty that pre-existed the Compact and that was owed to it by the Federal Defendants that would either support its general breach of trust claim or its claim that the Federal Defendants have breached a specific duty to the Nation in undertaking any of the challenged management activities in the Lower Basin.

No party contests that the United States has a trust responsibility to the Nation consistent with *Winters* that pre-existed the Compact. No party contests that the Nation was allocated no water right in the Lower Basin as a result of *Arizona v. California*. Yet when, as a current result of *Arizona v. California* the Nation has no present, existing and determined right in the allocation of that water, the Nation does not point to any duty that either existed before or after the Compact that requires the United States, in regulating the use of the waters between the present determined and existing rights holders, to include the potential future interest which may accrue to the Nation as a result of *Winters*. The allegation of such facts simply is insufficient to meet the specificity requirement set forth in *Gross Ventre* as a prerequisite for a breach of trust claim.[4] Further, the Nation's claim to Lower Basin water would be wholly unimpaired by any third-party claim that post-dated the time from which the Nation could base its claim through *Winters*. This only highlights the non-existence of a breach of trust claim against the United States for actions taken with third parties that post-date the time from which the Nation bases its claims.

**B.     Sovereign Immunity**

To bring Claim Seven or any other claim against the Federal Defendants, the Nation must also identify an applicable waiver of sovereign immunity. "A party may

---

[4] The Court, of course, makes no determination as to whether a claim for breach of trust could be stated against the United States under other factual circumstances, such as for example, if the Nation was unable to obtain on its own and the United States refused to otherwise pursue a determination whether the Nation had any right in Lower Basin waters.

bring a cause of action against the United States only to the extent [the United States] has waived its sovereign immunity. A party bringing a cause of action against the federal government bears the burden of demonstrating an unequivocal waiver of immunity." *Cunningham v. United States*, 786 F.2d 1445, 1446 (9th Cir. 1986) (citations omitted). "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). Further, "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Id.* As the SAC specifies that it seeks relief under the APA, 5 U.S.C. §§ 701–06 (*Id.* ¶ 8), the Court will consider whether that statute contains a waiver of sovereign immunity that would allow the Nation to bring its Claim Seven, even though the Nation does state that its Claim Seven falls outside the bounds of the APA (Doc. 282 at 67).

The APA waives sovereign immunity for certain actions brought against the Federal Government. 5 U.S.C. § 702. In relevant part, it states that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity . . . shall not be dismissed . . . on the ground that it is against the United States." *Id.* Section 704, which describes the scope of reviewable agency action under the APA, states in relevant part that judicial review extends to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. *See also Gallo Cattle v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998) (describing that "the APA's waiver of sovereign immunity contains several limitations" including § 704, which limits review to actions "made reviewable by statute or final agency action").

As the Nation notes, the Ninth Circuit has held that this § 704 limitation does not limit the § 702 waiver for some constitutional claims. *See Presbyterian Church v. United States*, 870 F.2d 518, 526 (9th Cir. 1989) (declining to read "§ 702 as preserving sovereign immunity in claims for equitable relief against government investigations alleged to violate First and Fourth Amendment rights"); *See also Robinson v. Salazar*,

885 F. Supp. 2d 1002, 1027–28 (E.D. Cal. 2012) (reconciling the Ninth Circuit's opinions in *Gallo Cattle* and *Presbyterian Church*, noting that *Presbyterian Church* was limited to the availability of a sovereign immunity waiver to bring constitutional claims). However, no such constitutional claims are present in this action. The APA also waives sovereign immunity under 5 U.S.C. § 706(1) for certain claims challenging agency inaction. However, a § 706(1) claim must assert that an agency failed to take a discrete agency action that it is actually required to take. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). The Nation concedes that it is not bringing any § 706(1) claims in this case. (Doc. 282 at 67.)

Here, Claim Seven is indeed a claim for relief other than damages, brought against the United States. However, Claim Seven does not challenge any final agency action or allege any constitutional claim. (Doc. 282 at 67.) Because the Nation fails to challenge any particular final agency action or bring a constitutional claim, Claim Seven falls outside of the scope of the APA's waiver of sovereign immunity and is thus barred. The Nation invites the Court to adopt a broad reading of *Presbyterian Church* that would expand its reading of the APA's waiver beyond constitutional claims to encompass a general breach of trust claim. *See Robinson*, 885 F. Supp. 2d at 1027–28; *but see Valentini v. Shinseki*, 860 F. Supp. 2d 1079, 1101 (C.D. Cal. 2012).The Court declines that invitation. The Nation alleges no other applicable waiver of sovereign immunity. Therefore, Claim Seven is dismissed as barred by the Federal Defendants' sovereign immunity.

## CONCLUSION

Plaintiff fails to establish the injury in fact necessary to confer standing to bring its claims One through Five and has voluntarily struck its Claim Six. In addition, Plaintiff fails to identify a waiver of sovereign immunity that permits it to bring Claim Seven. The Court thus lacks subject matter jurisdiction to consider the merits of the Nation's Second Amended Complaint. Due to this lack of subject matter jurisdiction, the Second Amended Complaint is dismissed without prejudice pursuant to the Federal Defendant's Motion to

- 15 -

Dismiss (Doc. 240). The Court denies the other pending Motions to Dismiss (Docs. 242, 243, 249, 250, 251, 253, 254) and the Hopi Tribe's Motion to Intervene (Doc. 252) as moot.

**IT IS THEREFORE ORDERED THAT:**

1.      Defendants United States Department of the Interior, Secretary of the Interior Sally Jewell, Bureau of Reclamation, and Bureau of Indian Affairs' (collectively the Motion to Dismiss (Doc. 240) is **granted**.

2.      Defendant-Intervenor State of Arizona's Motion to Dismiss (Doc. 242) is **denied as moot**.

3.      Defendant-Intervenors Metropolitan Water District of Southern California and Coachella Valley Water District's Motion to Dismiss (Doc. 243) is **denied as moot**.

4.      Defendant-Intervenors Salt River Project Agricultural Improvement and Power District and the Salt River Water Users' Association's Motion to Dismiss and to Join Required Parties (Doc. 249) is **denied as moot**.

5.      Defendant-Intervenor Central Arizona Water Conservation District's Motion to Dismiss (Doc. 250) is **denied as moot**.

6.      Defendant-Intervenor Imperial Irrigation District's Motion to Dismiss (Doc. 251) is **denied as moot**.

7.      Intervenor Hopi Tribe's Motion to Intervene (Doc. 252) is **denied as moot**.

8.      Intervenor Hopi Tribe's Motion to Dismiss (Doc. 253) is **denied as moot**.

9.      Defendant-Intervenors Colorado River Commission of Nevada, State of Nevada, and Southern Nevada Water Authority's Motion to Dismiss (Doc. 254) is **denied as moot**.

/ / /

/ / /

/ / /

/ / /

/ / /

- 16 -

10.     Plaintiff's Second Amended Complaint is dismissed without prejudice. The Clerk of Court is directed to terminate this action and enter judgment accordingly.

Dated this 22nd day of July, 2014.

G. Murray Snow
United States District Judge