**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Navajo Nation, | No. CV-03-00507-PCT-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| United States Department of the Interior, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff Navajo Nation's Renewed Motion for Leave to File Third Amended Complaint (Doc. 360). Intervenor-Defendants the Metropolitan Water District of Southern California, Coachella Valley Water District, Imperial Irrigation District, and State of Arizona oppose the Motion, (Doc. 369), and Defendant United States Department of the Interior opposes the Motion in part. (Doc. 370). All other Intervenor-Defendants join the brief filed by the Intervenor-Defendants named above. For the reasons outlined below, the Motion is denied.

## BACKGROUND

This motion continues a long-lived dispute between the Navajo Nation ("the Nation") and the United States Department of the Interior ("Interior"). Various other entities have intervened in this case as defendants ("Intervenor-Defendants"). Because the relevant history of this case was summarized in the Court's order on the Nation's previous motion for leave to amend, the Court will not recite that history again here. *See Navajo Nation v. Dep't of Interior*, No. CV-03-00507-PCT-GMS, 2018 WL 6506957 (D. Ariz. Dec. 11, 2018). The Court held argument on this motion on August 16, 2019.

# DISCUSSION

## I. Legal Standards

Leave for permissive amendments should be granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). While the policy favoring amendments is generally "applied with extreme liberality," *Eldridge v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987), leave to amend is not automatic. If there has been a showing of (1) undue delay; (2) bad faith or dilatory motives on the part of the movant; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; or (5) futility of the proposed amendment, the court should deny the motion. *Foman v. Davis*, 371 U.S. 178, 182 (1962). District courts have particularly broad discretion to deny leave to amend if the plaintiff has previously amended its complaint. *Sisseton-Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, North Dakota and South Dakota v. United States*, 90 F.3d 351, 355 (9th Cir. 1996) (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990)).

"An amendment is futile when no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (cleaned up).[1]

## II. Analysis

### A. Standards

The Nation's Proposed Third Amended Complaint ("TAC") alleges that the Federal Defendants have breached their trust responsibilities in two ways: (1) by failing "to determine the quantities and sources of water required to make the Navajo Reservation a permanent homeland for the Navajo people," and (2) by failing "to protect the sovereign interests of the Navajo Nation by securing an adequate water supply to meet those homeland purposes." (Doc. 360-2 at 3.) Intervenor-Defendants contend that leave to amend should be denied as futile because the "[t]he mere existence of a trust relationship

---

[1] "Cleaned up" is a new parenthetical used to eliminate excessive, unnecessary explanation of non-substantive prior alterations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143 (2018). This parenthetical can be used when extraneous, residual, non-substantive information has been removed—in this case, citations and quotation marks. *See United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018); *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

between the United States and the Navajo Nation is, by itself, an insufficient basis for an actionable claim." (Doc. 369 at 4).

A general trust relationship exists between the United States and Indian nations. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). But "[t]he *general* relationship between the United States and the Indian tribes is not comparable to a private trust relationship." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173 (2011) (quoting *Cherokee Nation of Okla. v. United States*, 21 Cl. Ct. 565, 573 (1990)) (emphasis in original). To state a cognizable claim of breach of trust against the government, a tribe must "identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed to perform those duties." *Navajo I*, 537 U.S. at 506. If the tribe does so, common law trust principles "could play a role" in the court's analysis of the trust duties undertaken by the government. *Jicarilla*, 564 U.S. at 177 (quoting *United States v. Navajo Nation*, 556 U.S. 287, 301 (2009) ("*Navajo II*")).

But "[w]hen [a] Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, neither the Government's control over Indian assets nor common-law trust principles matter. . . . The Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *Id. See also Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) ("While it is true that the United States acts in a fiduciary capacity in its dealings with Indian tribal property, it is also true that the government's fiduciary responsibilities necessarily depend on the substantive laws creating those obligations."). Put another way, "unless there is a specific duty that has been placed on the government with respect to Indians, the government's general trust obligation is discharged by the government's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) (quoting *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998)) (cleaned up). Thus, the Nation must allege a substantive source of law that creates the specific duty that it alleges the government has violated, or that at least "permit[s] a fair inference that the Government

is subject to duties as a trustee." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474 (2003).

The Nation contends that *Jicarilla* is the wrong standard to apply in actions for injunctive relief. But even though *Jicarilla* and many of the cases cited were actions brought by tribes for money damages under the Indian Tucker Act, 28 U.S.C. § 1505, the Ninth Circuit has applied the standard in cases brought for injunctive or declaratory relief. *See Gros Ventre Tribe*, 469 F.3d at 812; *Morongo Band*, 161 F.3d at 573–74. In *Gros Ventre Tribe*, for example, the tribe argued that the *Mitchell* standard (*i.e.*, the standard the Supreme Court applied in *Jicarilla*) only applied to claims for money damages. *Gros Ventre Tribe*, 469 F.3d at 812. The tribe argued instead that the general trust relationship between the federal government and the tribe "imposes duties on the federal government even in the absence of a specific treaty, agreement, executive order, or statute." *Id.* The Ninth Circuit disagreed. The court instead concluded that "unless there is a specific duty that has been placed on the government with respect to Indians, [the general trust responsibility] is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Id.* In this circuit, then, tribes must point to a specific treaty, agreement, executive order, statute, or regulation that the government violated in order to bring a breach of trust claim, even one for injunctive relief rather than money damages.

### B.  *Winters* **and Treaties**

The Nation's strongest argument is that the United States has trust duties arising from the treaties signed between the two parties and the Nation's implied water rights under *Winters v. United States*, 207 U.S. 564 (1908). *Winters* was a suit brought by the United States on behalf of various tribes to prevent other parties from diverting water from the Milk River upstream of the Fort Belknap Indian Reservation. *Id.* at 565. The tribes had previously entered treaties with the United States by which the lands of the reservation had been set aside for the tribes. *Id.* The Milk River formed one of the boundaries of the reservation, and the tribes needed water from the river to irrigate reservation land that was

1  otherwise unsuited for cultivation. *Id.* at 566. The defendants—other landowners in the area—began constructing dams, reservoirs, and canal systems by which they diverted the river water. *Id.* at 567. Since they had begun to divert river water before the tribes had done so (but after the reservation had been created), the defendants contended, their water rights were superior to those of the tribes. *Id.* at 568–69.

The Court disagreed. In its view, the treaties entered by the tribes had the aim of transforming the tribes' previous lifestyle to one of settled farming. *Id.* at 576. But the lands reserved for the tribes were "arid, and without irrigation, were practically valueless." *Id.* Applying a canon of construction which requires that "ambiguities occurring [in agreements and treaties with tribes] will be resolved from the standpoint of the Indians," the Court concluded that the tribes had not given up their rights to the water, without which their reservation would not be suitable for its intended purpose. *Id.* at 576. Yet, while approving the government's actions in protecting the water rights at issue, the Court said nothing about any trust duty imposed on the government to secure the tribes' water rights.

Later decisions distilled *Winters* into a black-letter rule of law: "[W]hen the United States withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water District*, 849 F.3d 1262, 1268 (9th Cir. 2017) (citing *Cappaert v. United States*, 426 U.S. 128, 138 (1976)).

Like many tribes, the Navajo Nation signed various treaties with the federal government, resulting in the creation of the Navajo Reservation, the largest tribal reservation in the United States. Through the *Treaty with the Navaho, 1849*, Sept. 9, 1849, 9 Stat. 974 ("1849 Treaty"), and the *Treaty with the Navaho, 1868*, June 1, 1868, 15 Stat. 667 ("1868 Treaty"), the United States placed the Nation under its "exclusive jurisdiction and protection" and declared that the Nation "would forever remain" so. *1849 Treaty,* at ¶ I. The Nation agreed to make the Navajo Reservation its "permanent home," and to "not as a tribe make any permanent settlement elsewhere." *1868 Treaty,* Art. 13. Thus under

*Winters*' federal reserved rights doctrine, the creation of the Navajo Reservation also impliedly set aside rights to enough appurtenant water to allow the Reservation to function as the permanent home of the Navajo people. *Navajo Nation v. Dep't of Interior*, 876 F.3d 1144, 1156 (9th Cir. 2017) (citing *Arizona v. California*, 373 U.S. 546, 600 (1963)).

The Nation contends that because *Winters* recognized implied, reserved water rights, the Federal Defendants, under the treaties with the Nation, have fiduciary duties to (1) "determine the quantities and sources of water required to make the Navajo Reservation a permanent homeland for the Navajo people," and (2) "protect the sovereign interests of the Navajo Nation by securing an adequate water supply to meet those homeland purposes." (Doc. 360-2 at 3.) This assertion runs into several problems.

The first is that to the extent that the Nation would have this Court determine that the United States has violated its trust responsibility by failing to appropriate sufficient appurtenant water from the mainstream of the lower Colorado River, that determination cannot be made by this Court in light of the Supreme Court's reservation of the question. (*See* Doc. 359 at 2–4) (concluding that the broad language of the Supreme Court's reservation of jurisdiction in *Arizona v. California*, 547 U.S. 150, 166–67 (2006),[2] deprives this Court of jurisdiction "over any claim that requires any determination of rights to the [lower Colorado] River."). To the extent, then, that the Nation bases its claim on any *Winters* rights in the mainstream of the Lower Colorado, those rights cannot support the claim in this Court. Such a claim would have to be filed with the Supreme Court.

This Court has already so ruled. Yet, in its proposed Third Amended Complaint, the Nation sets forth considerable allegations about the government's regulation of the Colorado River to support its breach of trust claim. Not only do these allegations go beyond the scope of the remand in this case, *see Navajo Nation,* 876 F.3d at 1173, but they

---

[2] In *Arizona v. California*, the Supreme Court "retain[ed] jurisdiction of this suit for the purpose of any order, direction, or modification of the decree, or any supplementary decree, that may at any time be deemed proper in relation to the subject matter in controversy." 547 U.S. at 166–67. The "subject matter in controversy" in *Arizona v. California* was the allocation of water rights to the mainstream of the lower Colorado River. *See Arizona v. California*, 376 U.S. 340 (1964); *Navajo Nation*, 876 F.3d at 1154.

run headlong into the Supreme Court's reservation of jurisdiction in *Arizona v. California*. In order to determine that the United States breached its trust duties by taking the actions complained of, the Court would have to determine that the Nation in fact has rights to the water in the mainstream of the Lower Colorado River. To the extent the Nation wishes to use the government's regulation of the Colorado River as a basis for its breach of trust claim, it asks this Court to assume facts that are beyond its jurisdiction.

Further, despite the earlier uninformed musings of this Court at previous oral argument, *Winters* rights can only apply to water appurtenant to the reservation. *See Agua Caliente Band*, 849 F.3d at 1268 ("[T]he *Winters* doctrine only applies in certain situations: it only reserves water to the extent it is necessary to accomplish the purpose of the reservation, and it only reserves water if it is appurtenant to the withdrawn land.") (citing *Winters*, 207 U.S. at 575–78; *Cappaert*, 426 U.S. at 138).[3] For the reasons above stated, this Court cannot decide matters pertaining to the allocation of the mainstream of the lower Colorado River. And the TAC specifically states that the Nation is not basing its breach of trust claim on the government's failure to secure rights to the water of the Little Colorado River because litigation over its rights in that water is still ongoing. (*See* Doc. 361 at 20–21) ("[T]he Federal Defendants have not sought to identify or secure water from any sources other than the Little Colorado River that could meet the needs of [the] Navajo Nation in Arizona."); (*id.* at 19) (noting ongoing Little Colorado River rights adjudication in Arizona state court). Since the Nation does not base its claim on identified and appurtenant water, it obtains no help from *Winters*. And to the extent it bases its claim on the appurtenant rights to water in the mainstream of the Colorado River, this Court has no jurisdiction to hear that claim.

/ / /

---

[3] At oral argument, the United States took the position that "appurtenant" is a legal concept and that is therefore not necessarily limited to only water geographically appurtenant to the Navajo Reservation. The government points to a Ninth Circuit decision, *Katie John v. United States*, 720 F.3d 1214 (9th Cir. 2013). However, as noted, the Ninth Circuit's more recent statement of the limitation on *Winters* suggests that appurtenancy is in fact a geographic limitation. *See Agua Caliente Band*, 849 F.3d at 1268.

And in any event, the enforceable trust duties the Nation asserts are not inferable from the mere existence of implied water rights. The undisputed existence of the Nation's implied, as-yet-unquantified rights to some as-yet-undetermined appurtenant water does not create those duties. "The Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *Jicarilla*, 564 U.S. at 177. The Nation's *Winters* rights do not expressly create those responsibilities. So the Nation must point to some other source that creates them.

### C. Other potential sources of trust duties

The Nation disagreed with this conclusion at oral argument. The Nation instead maintained that its claim need not be based on any statutory enumeration of duties because it is bringing a common law claim for injunctive relief rather than a damages claim. The TAC sets forth a host of sources which the Nation claims illustrate the ways in which the Federal Defendants have breached their common law trustee duties. The Nation asserts that the authorities cited in the TAC are illustrative of the duties, but do not necessarily give rise to the duties. But the Nation cannot bring a breach of trust claim "wholly separate from any statutorily granted right." *Gros Ventre Tribe*, 469 F.3d at 812. So if the Nation's claim is to survive, the duties must arise from some source. The authorities the Nation cites, particularly in ¶¶ 24–36 of the TAC, might give rise to those duties. However, upon examination, none of the sources are "specific, applicable, trust-creating statute[s] or regulation[s] that the Government violated." *See Jicarilla*, 564 U.S. at 177. Allowing the amendments to the Nation's complaint would thus be futile because "no set of facts can be proved under [it] that would constitute a valid and sufficient claim." *Koster*, 847 F.3d at 656.

A brief review of the two Supreme Court cases establishing the standard discussed in *Jicarilla* is helpful here. In *United States v. Mitchell*, 445 U.S. 535 (1980) ("*Mitchell I*"), the Court held that the General Allotment Act of 1887 did not create a fiduciary duty on the part of the federal government to manage the timber resources of the Quinault Indian Reservation. 445 U.S. 535, 542 (1980). The Act, which required the United States to hold

land "in trust" for Indian allottees, was not specific enough to create enforceable fiduciary duties regarding the management of timber resources on tribal land. *Id.* The Act established only a "limited" relationship and therefore imposed no specific duty to manage timber resources. *Id.* The Court remanded the case for consideration of whether other statutes might impose the duty alleged by the Tribe.

In the case's return trip, *United States v. Mitchell* ("*Mitchell II*"), the Court held that several timber management statutes enacted after the General Allotment Act did create enforceable trust duties regarding the management of tribal timber resources. 463 U.S. 206, 224–25 (1983). For example, one statute required the Secretary of the Interior to consider "the needs and bests interests of the Indian owner [of the land] and his heirs" before selling timber from Indian trust lands. *Id.* at 222 (citing 25 U.S.C. § 406(a)). The same statute required the Secretary to consider the need for "maintaining the productive capacity of the land for the benefit of the owner and his heirs," whether other uses of the land would be most beneficial to the owner and his heirs, and "the present and future financial needs of the owner and his heirs." *Id.* Statutes also required the government to manage Indian forest resources, obtain revenue through that management, and pay the proceeds to the tribal landowners. *Id.* at 219–23. The Court held that the statutes were specific enough to allow for an action against the government for mismanagement of those resources. *Id.* at 224–27.

None of the statutes or regulations the Nation points to here[4] are as specific as the statutes in *Mitchell II*—none create enforceable duties on the part of the Federal Defendants to (1) determine the amount of water needed to make the Navajo Reservation a permanent homeland or (2) secure adequate water to meet those homeland purposes.

The Nation first points to the Indian Health Care Amendments of 1988, 25 U.S.C. § 1632, which state that "it is in the interest of the United States, and it is the policy of the United States, that all Indian communities and Indian homes, new and existing, be provided

---

[4] This assumes, of course, that all the documents the Nation cites could in fact create the enforceable trust duties they assert. The parties have not briefed the issue, and for the purposes of this analysis the Court assumes that they could.

with safe and adequate water supply systems and sanitary sewage waste disposal systems as soon as possible." *Id.* (a)(5). But this language does not establish a specific duty—it merely sets forth a policy position. The language is insufficient to create an enforceable trust duty. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 155 (D.D.C. 2017). And even if it did, it would not be the duties the Nation alleges.

Similarly, the Bureau of Reclamation's Manual does not create enforceable duties. The Manual states that the Bureau of Reclamation "will discharge, without limitation, the Secretary's Indian trust responsibility with a high degree of skill, care, and loyalty," and that it will "actively support and participate in the Department's Indian water rights negotiation and implementation activities, as it works to resolve the water rights claims of Indian tribes through negotiated settlements, if feasible, rather than litigation." Bureau of Reclamation, *Reclamation Manual*, NIA P10 at 5 ¶ 5(C)(2). This language, while noting the existence and importance of the trust relationship and pledging engagement in the resolution of Indian water rights negotiation and implementation activities, does not create the fiduciary duties the Nation alleges.

The other statutes, regulations, and executive actions likewise fail to show that the government expressly accepted the fiduciary duties the Nation asserts. The "Krulitz Memo" discusses at length the general trust relationship that exists between Indian tribes and the United States but does not impose a duty to analyze the Nation's need for, and secure a sufficient supply of, water. *See* Letter from Leo. M. Krulitz, Department Solicitor, to James W. Moorman, Assistant Attorney General (Nov. 21, 1978), (attached as appendix to *Brief for Respondents*, *United States v. Mitchell*, 445 U.S. 535 (1979), 1979 WL 199447). To the extent that the Memo concludes that "the government's trust responsibility to the Indian has an independent legal basis and is not limited to the specific language of the statutes, treaties and agreements," *id.* at *14A, the Supreme Court disagreed in *Mitchell I*—the very case in which the Krulitz Memo was submitted as an appendix to a brief.

/ / /

Secretarial Order No. 3335 likewise does not create enforceable duties—in fact, it specifically states that the Order "does not[] create any . . . legal right or benefit, substantive or procedural." Secretarial Order No. 3335, *Reaffirmation of the Federal Trust Responsibility to Federally Recognized Indian Tribes and Individual Indian Beneficiaries* at § 6 (Aug. 20, 2014). The two other Secretarial Orders the Nation points to likewise fail to expressly obligate the United States to determine the amount of water the Nation needs or to secure rights to sufficient water. *See* Secretarial Order No. 3215, *Principles for the Discharge of the Secretary's Trust Responsibility* at § 6 (Apr. 28, 2000) ("This Order . . . is not intended to, and does not, create any right to administrative or judicial review, or any legal right or benefit, substantive or procedural, enforceable by a party against the United States, its agencies, or instrumentalities, its officers or employees, or any other person"); Secretarial Order 3175, *Departmental Responsibilities for Indian Trust Resources* (Nov. 8, 1993) ("This Order is for internal management guidance only, and shall not be construed to grant or vest any right to any party in respect to any Federal action not otherwise granted or vested by existing law or regulations.").

The Non-Intercourse Act limits the alienability of Indian lands but imposes no duty to make the Navajo Reservation productive by analyzing water needs and securing water rights. *See* 25 U.S.C. § 177. While the Nation may be correct that the Act "pre-dates the United States Constitution and is reflective of the course of dealings between the United States and Indian tribes, including the duty of protection," nothing in the Act acts as an express acceptance by the United States of the trust duties the Nation asserts. *See Jicarilla*, 564 U.S. at 177.

The Northwest Ordinance of 1787, while recognizing that the government has a duty to deal with Indian tribes in the "utmost good faith," does not impose the specific duties alleged. 1 Stat. 50, 52 (1789). The Snyder Act, 25 U.S.C. § 13, also does not establish those trust duties—rather, it directs the Bureau of Indian Affairs to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States . . . for the

development of water supplies." But nowhere does it require the United States to analyze the extent of the Nation's water needs and secure water rights on its behalf.

The American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239, does not impose a specific duty to secure water resources to make the Navajo Reservation productive, but imposes only a general responsibility to "appropriately manag[e] the natural resources located within the boundaries of Indian reservations and trust lands." 25 U.S.C. § 162a(d)(8). The Indian Trust Asset Reform Act, 25 U.S.C. §§ 5601–36, likewise does not create such a duty. While the Act acknowledges that the United States has undertaken "enforceable Federal obligations to which the national honor has been committed," *id.* § 5601(5), it does not create the specific obligations the Nation seeks to enforce here.

Since none of these substantive sources of law create the trust duties the Nation seeks to enforce, and the Nation "cannot allege a common law cause of action for breach of trust that is wholly separate from any statutorily granted right," *Gros Ventre Tribe*, 469 F.3d at 810, its breach of trust claim must fail, and amendment would be futile. *Koster*, 847 F.3d at 656. "Although the [Nation] may disagree with the current state of Ninth Circuit caselaw, as it now stands, unless there is a specific duty that has been placed on the government with respect to Indians, the government's general trust obligation is discharged by the government's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Id.* The general trust relationship between the Nation and the United States is insufficient to support the Nation's breach of trust claim. *See Navajo I*, 537 U.S. at 506.

**IT IS THEREFORE ORDERED** that Plaintiff Navajo Nation's Renewed Motion for Leave to File Third Amended Complaint, (Doc. 360), is **DENIED**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action and enter judgment accordingly.

Dated this 23rd day of August, 2019.

G. Murray Snow
Chief United States District Judge